UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

——————

BRANDON MARCUS RESCH,

                    Plaintiff,                          Case No. 1:21-cv-293

v.                                                      Honorable Janet T. Neff

ARTHUR DUDLEY CAMPFIELD et al.,

                    Defendants.

_____/

## OPINION

        This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983.

Rule 21 of the Federal Rules of Civil Procedure provides that, on motion by a party or on its own

motion, the Court may at any time drop or add parties or sever a claim on grounds of misjoinder.

*Id.*  Applying that standard, the Court will dismiss without prejudice Plaintiff's claims against

Defendants Campfield, Washington, Horton, Rewerts, Adamson, Beaulieu, Gonzolas,

Allenbaugh, Labo, Wellman, Brunettea, Stavida, Rink, Buchanan, Purchase, Ray, Edlinger,

Ferrell, Allen, Rideout, Freed, Erskine, Bartin, Sperling, Depue, Keck, Gable, Houghton, Holmes,

Hoffman, Dine, Lambert, Ward, and Stott, because they are misjoined.

        Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321

(1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if

the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or

seeks monetary relief from a defendant immune from such relief.  28 U.S.C. §§ 1915(e)(2), 1915A;

42 U.S.C. § 1997e(c).  The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v.

Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly

irrational or wholly incredible.  *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).  Applying this standard, the Court will dismiss with prejudice, for failure to state a claim, Plaintiff's complaint against Defendant Martin and Plaintiff's access-to-the-courts and Eighth Amendment claims against Defendant Bush.

## Discussion

### I.      Factual Allegations

Plaintiff presently is incarcerated with the Michigan Department of Corrections (MDOC) at the Carson City Correctional Facility (DRF) in Carson City, Montcalm County, Michigan.  The events about which he complains occurred at that facility and at the Charles Egeler Reception & Guidance Center (RGC) in Jackson, Jackson County, Michigan, and the Chippewa Correctional Facility (URF) in Kincheloe, Chippewa County, Michigan.  Plaintiff initially sued 40 Defendants, three of whom have since been voluntarily dismissed from the case.  (*See* May 17, 2001, and September 17, 2001, Notices of Voluntary Dismissal, ECF Nos. 4, 9.[1])  Plaintiff now sues MDOC Director Heidi Washington, MDOC Correctional Facility Administration (CFA) Special Activities Coordinator (SAC) Steven Adamson, and former SAC Michael Martin, as well as the following officials at the various facilities:  RGC Warden Jeremy Bush; RGC Food Services Director Unknown Mulligan; URF Warden Connie Horton; URF Americans with Disabilities Act (ADA) Coordinator Unknown Beaulieu; URF Dietician Kelly M. Wellman; URF Food Stewards Unknown Brunettea and Unknown Stavida; URF Chaplain David Rink; URF Nurse Practitioner (NP) Brenda L. Buchanan; DRF Warden Randee Rewerts; DRF ADA Coordinator Dana Gonzolas; DRF Nurse Unknown Allenbaugh; DRF Doctor Scott Holmes; DRF Physician's Assistant (PA)

---

[1] In the May 17, 2021, notice, Plaintiff voluntarily dismissed DRF Prisoner Counselor Unknown Leik.  In the September 17, 2021, notice, Plaintiff voluntarily dismissed DRF Correctional Officer Unknown McAlvey and Prisoner Counselor Unknown Ward.  Correctional Officer Ward remains in the case.

Kyle Sperling; DRF Health Unit Manager (HUM) Todd Lambert; DRF Food Service Director Unknown Labo; DRF Prisoner Counselors (PCs) Unknown Purchase and Unknown Hoffman; DRF Chaplain Unknown Erskine; DRF Correctional Officers Unknown Ray, Unknown Edlinger, Unknown Ferrell, Unknown Allen, Unknown Rideout, Unknown Freed, Unknown Bartin, Unknown Depue, Unknown Keck, Unknown Gable, Unknown Houghton, and Unknown Ward; DRF Mailroom Supervisor Don Dine; DRF Advanced Substance Abuse Treatment (ASAT) Program Facilitator[2] and DRF official Unknown Stott (whose title is not included in the complaint).

Plaintiff's allegations span the time period beginning August 31, 2018, when he entered the custody of the MDOC at RGC, through February 22, 2020, when Defendant Campfield refused to allow Plaintiff to participate in the ASAT program.   During the course of his confinement since arriving on August 31, 2018, Plaintiff has been housed in at least four facilities: (1) in RGC from August 31, to October 5, 2018; (2) at the Earnest C. Brooks Correctional Facility (LRF) in Muskegon, Michigan from October 5, 2018, to approximately March 22, 2019; (3) at URF from approximately March 22, 2019, to sometime between August 14 and September 5, 2019[3]; and (4) at DRF from that time until the present.   Plaintiff's allegations are a litany of complaints about everything that has occurred during his incarceration.   They are not well-organized, jumping back and forth in time and frequently failing to identify the location at which

---

[2] Plaintiff alleges that Defendant Campfield is employed at DRF under a contract between the MDOC and the Catholic Charities of Jackson, Lenawee, and Hillsdale Counties.

[3] Plaintiff does not indicate the date on which he left URF.  However, Plaintiff alleges facts against URF Defendant Rink that occurred as late as August 14, 2019.  (Compl., ECF No. 1, PageID.10, ¶ 64.)  In addition, he complains that DRF Food Services Director Labo served him non-kosher bread from September 5, 2019, through May 1, 2020, while he was on the kosher-diet plan.  In order for Defendant Labo to have caused the alleged harm, Plaintiff must have been at DRF by September 5, 2019.

the events occurred.  However, piecing together Plaintiff's allegations, the Court will break down Plaintiff's claims chronologically and by place of incarceration.

### A.    Events arising at RGC

Plaintiff sues only three officials—RGC Warden Jeremy Bush, RGC Food Service Director Unknown Mulligan, and former SAC Director Martin—in relation to the 35 days he spent at RGC.

Plaintiff alleges that, when he arrived at RGC on August 31, 2018, he immediately told the intake person, an unknown nurse, and Correctional Officer Foster (not defendants) that he required a kosher diet, due to his sincerely held religious beliefs.  Based on conflicting instructions from these individuals and other inmates, Plaintiff submitted kites to Defendant Warden Bush, the RGC chaplain (not a defendant), the RGC inspector (not a defendant), and Defendant Food Service Director Mulligan, in which he requested a kosher diet.

At some point, Plaintiff stopped Defendant Bush during rounds and informed Bush that he had been unable to obtain a kosher diet.  Defendant Bush told Plaintiff that they could get a kosher tray from Duane Waters Hospital (DWH) or from the local prison across the street, "but we . . . aren't going through all of that trouble for just one prisoner.  You'll be out of [RGC] soon enough.  Just wait until you reach the next prison." (Compl., ECF No. 1, PageID.6.)  On September 10, 2018, Plaintiff stopped the RGC Inspector and informed him about Plaintiff's continuing inability to get a kosher diet.

Plaintiff filed a formal grievance about the problem on September 6, 2018, but he received no response.  He filed another grievance on September 11, 2018.  On September 12, Plaintiff spoke directly with the RGC chaplain, advising that he had received no responses to his kites.  The chaplain instructed Plaintiff to file another kite and send it directly to the chaplain. Plaintiff promptly did so, and he received a response, together with the forms necessary to obtain

a kosher diet.  Plaintiff completed the forms, including a "quasi-test" (*id.*) that was to be evaluated

by Defendant Martin.  Defendant Martin apparently approved the kosher diet (*id.*), but Plaintiff

never received a kosher diet while he resided at RGC.  At one point, Defendant Mulligan stated,

> You're the only Jew on the compound.  Do you really think anyone is going to
> create a special religious diet for just you? . . . I've already spoken with [Defendant
> Bush] and it's been decided we're not accommodating that/the Jewish diet here.
> Go file your grievances.  This conversation is done.

(*Id.*, PageID.7.)

Plaintiff also complains that, under Defendant Bush's policies, he was denied his

right to access the courts while at RGC, in both the appeal of his criminal conviction and in his

civil case, *Resch v. Municipality of Macomb Cnty.*, No. 2:18-cv-13607 (E.D. Mich.).  Plaintiff

complains that RGC policies required him to request materials by citation and to make only two

requests per week, with each request listing no more than five items.  Plaintiff also alleges that he

was denied a legal writer.  He argues that the policy caused him psychological harm.

In addition, Plaintiff argues that, under Defendant Bush's policies, Plaintiff

received only 50 minutes of out-of-cell exercise every 49 to 72 hours.  Plaintiff alleges that the

limits on out-of-cell exercise caused him physical harm and pain, as well as emotional distress.

### B.    Allegations arising at URF

In his second set of claims,[4] Plaintiff sues the following URF officials:  Warden

Horton; ADA Coordinator Beaulieu; Dietician Wellman; Food Stewards Brunnetea and Stavida;

Chaplain Rink; and NP Buchanan.

When he arrived at URF on approximately October 5, 2018, Plaintiff immediately

notified Defendant Rink that he needed a kosher diet.  Plaintiff also asked to participate in the

---

[4] Plaintiff neither makes allegations about events that occurred at LRF nor raises claims against officials at LRF,
though he was housed at LRF before being transferred to URF.

Jewish high holy days of Passover.  Defendant Rink apparently failed to place him on the Passover-meal list.  On two occasions during Passover, Defendants Brunettea and Stavida told Plaintiff that they did not have Passover meals for him while making disparaging remarks about Plaintiff's religion.

Plaintiff wrote multiple formal requests to Defendants Horton and Rink, asking them to intervene to get him an alternative to soy products, on which the kosher-diet plan heavily relied.  Plaintiff complained that he had an intolerance to soy.  On July 8, 2019, Plaintiff asked Defendant Rink to place him on the alternative religious diet.  On approximately the same date, Plaintiff submitted a request to Defendant Wellman, seeking a therapeutic diet. Defendant Wellman refused to evaluate him or treat him for his soy intolerance.

Plaintiff met with Defendant Rink on July 17, 2019.  Rink provided Plaintiff with a three-question "test" to be considered for the alternative religious diet and instructed Plaintiff to place it in the regular mail addressed to Defendant Rink.  Plaintiff completed the form and placed it in the regular mailbox for Defendant Rink.  Plaintiff also repeatedly requested access to Jewish religious services at URF, but he was not allowed to attend services between March 22 and July 1, 2019.

### C.    Allegations arising at DRF

Plaintiff complains that, at some point after his transfer to DRF, he received a kosher meal containing rodent feces.  The contamination was witnessed by at least two correctional officers.  Despite acknowledging that the rodent feces were probably rat, rather than mouse, feces, Defendant DRF Correctional Officer Edlinger denied Plaintiff's request for a replacement kosher meal.  Edlinger told Plaintiff to either get a regular meal tray or go without breakfast.

In addition, Plaintiff complains that Defendant HUM Lambert ignored Plaintiff's repeated written requests to be evaluated and treated for his intolerance to soy products.  Defendant

Dr. Holmes also ignored Plaintiff's in-person request in the latter part of 2019 for evaluation of his soy intolerance.  Instead, Defendant Holmes inquired about Plaintiff's religious affiliation and advised him to change religions to one that did not require a religious diet.

Plaintiff also complains that, between September 5, 2019 and May 1, 2020, Defendant Food Service Director Labo served non-kosher bread on the religious menu.  Plaintiff states that he personally advised Defendant Labo of the problem after finding that the purportedly kosher bread stored in the freezer lacked the proper kosher labeling.  Plaintiff file a grievance, but it was rejected on the ground that the issue was non-grievable, since it involved prisoners in addition to Plaintiff.  Plaintiff then asked the Warden's Forum representative to raise the issue in the Warden's Forum, and the prisoner-representative agreed to do so, in order to bring the matter to Warden Rewerts' attention.  Following the filing of Plaintiff's grievance, Defendants Bartin, Edlinger, and Ferrell allegedly threatened Plaintiff with unidentified forms of retaliation and verbally harassed Plaintiff.

Plaintiff filed multiple requests, both through health care and through the chaplain, for an alternative religious diet.  Defendant SACs Adamson and Marton refused to process Plaintiff's requests until September 21, 2020, when Adamson denied Plaintiff's three pending petitions.

Plaintiff alleges that, on September 15, 2019, he was assigned to a cell that had a significant amount of black mold on two walls and the window.  Plaintiff's cellmate reported that the mold had been there for months and that he had repeatedly reported it to housing officers.  On November 2, Plaintiff's body began to break out in rashes and hives.  After two days, Plaintiff sent a kite to health care.  A week later, Plaintiff was seen by Defendant Dr. Holmes, who advised that the symptoms were frequently associated with black mold.  But Holmes told Petitioner that he was

looking fine at that point, so there was nothing more that Holmes could do.  Plaintiff, however, continued to experience breathing difficulties, persistent itching, and headache for four additional days.  Plaintiff reported it to RUM Beecher (not a defendant) on November 18.  On November 20, Beecher inspected the cell and determined that black mold appeared to be present.  Beecher indicated that maintenance would be called.

Because of his rash, Plaintiff was again sent to health care on approximately December 4, 2019.  Defendant Sperling provided Plaintiff 50 mg of Benadryl but instructed him to return to the same cell that had likely caused the problem.

Plaintiff again broke out in a rash and hives on December 22, 2019.  He was sent to health care, where he waited for an hour without treatment before being told that they were waiting for approval for his antihistamine.  Plaintiff returned to his cell for shift change, and he did not receive the promised antihistamine that day.  The following day, a nurse instructed Plaintiff to complete another health care request.  On the night of December 24–25, 2019, Plaintiff unconsciously scratched his hives, and he awoke to wet blood and pus.  CO Morrel (not a defendant) noticed the wounds and called health care.  Morrel was told that Plaintiff had an appointment on January 9, 2020.  Plaintiff asked Morrel to call again and tell them about the pus and blood.  At about 8:00 p.m. on December 25, a nurse conducting rounds on the ward treated the wound with antiseptic and gauze pads.  About 40 minutes later, a different nurse assessed the wound, applied disinfectant and antibiotic cream, and replaced the gauze pad.  As a result of the infection, Plaintiff had to report to health care for nine days in succession, to have his wound scraped and re-dressed.

Plaintiff next alleges that Defendant COs Purchase, Edlinger, and Keck denied his repeated requests for a hygiene kit from October 25, 2019 through December 2, 2019.  Plaintiff

apparently filed a grievance, after which Defendants Purchase and Edlinger began to threaten unspecified retaliation unless he signed off on the grievance.  Plaintiff alleges that Defendant Washington has a policy that prevented Plaintiff from seeking indigent status for an entire month, resulting in Plaintiff receiving no indigent loans for the entire month of September.  Plaintiff was able to apply for indigent status in October, but he was not allowed to make a commissary order for hygiene products until October 28, 2019.  He did not receive the commissary order until December 2, 2019.  Plaintiff complains that Defendant Washington's policy prevents indigent prisoners such as himself to go without basic hygiene products for months.

Plaintiff alleges that on December 10, 2019, Defendants Edlinger summoned Plaintiff to discuss the grievance, stating, "Are you sure these are the games you want to play with us?"  (*Id.*, PageID.12.)  On December 11, Defendant Ferrell refused to sign Plaintiff's daily schedule, which resulted in Plaintiff being unauthorized to go to the law library.  Ferrell told Plaintiff that he refused to sign "[b]ecause you wrote a grievance on toothpaste."  (*Id.*)

Defendant Ray apparently issued a Class-III misconduct charge against Plaintiff for an unspecified reason.  On December 11, 2019, Defendant Ferrell reviewed Plaintiff on the misconduct charge, where he stated, "See where grievances got you?  (*Id.*)  When Plaintiff asked if the misconduct report was the result of his grievances, Ferrell respond, "Yup."  (*Id.*)  Defendant Allen served as the hearing officer on the misconduct charge on December 12.  At the hearing, Allen asked, "Resch, what the hell happened with you, [Defendant] Edlinger, and [Defendant] Ferrell these past few days?"  (*Id.*)  Plaintiff explained that the officers were upset by his grievances.  Allen then explained that he was finding against Plaintiff on the misconduct charge, because he had been in the MDOC academy with Defendant Edlinger and had to side with him. Defendant Allen imposed a 10-day sanction on Plaintiff.

On December 13, 2019, Plaintiff filed a Step-I grievance against Defendants Purchase, Bartin, Edlinger, and Farrell, alleging harassment and retaliation.  On December 16, 2019, Defendant CO Rideout issued a Class-II misconduct ticket against Plaintiff, as well as a notice of intent to conduct an administrative hearing about Plaintiff's possession of a milk carton. Plaintiff alleges that the misconduct charge was issued in retaliation for his grievance and that Defendant Rideout told him that, if he filed more grievances, his next misconduct charge would be for a Class-I misconduct.  On December 31, 2019, Defendant Bartin verbally threatened Plaintiff with further misconduct reports after noting that Plaintiff had gotten out of the last two charges.

On January 2, 2020, Plaintiff was reassigned to a cell on a different unit.  When he arrived, Defendant Purchase was loudly identifying Plaintiff to Defendant Freed as their "griever." (*Id.*, PageID.15.)  Another prisoner also informed Plaintiff that Defendant Freed had it out for Plaintiff and had just told the prisoner to steer clear of Plaintiff.  Defendant Freed allegedly threatened to file misconduct charges against Plaintiff on February 23 and 26 and March 30, 2020, if Plaintiff filed grievances.

The remaining events occurred sporadically over the next year.  Defendant Dine allegedly violated Plaintiff's First Amendment rights by failing to train officials who improperly opened Plaintiff's incoming legal mail on January 7, March 17, and April 6, 2020, and January 6, 2021.  On March 9, 2020, Defendant Erskine denied Plaintiff his right to participate in the Jewish feast of Esther.  Defendant Sperling made an ethnically insensitive statement on March 19, 2020. On April 6, 2020, Defendant Freed filed an allegedly false misconduct charge against Plaintiff for disobeying a direct order in refusing to put on a facemask.  On April 14, 2020, Defendant Stott demanded to know if Plaintiff would sign off on his grievance against Freed, and, when Plaintiff

refused, conducted a search of Plaintiff's cell and wrote a false Class-I misconduct ticket against Plaintiff for having dangerous contraband.  On May 8, 2020, Defendant Hoffman allegedly violated Plaintiff's right to due process by conducting an administrative hearing against Plaintiff without an American Sign Language (ASL) interpreter.  As a result of the hearing, Defendant Erskine allegedly violated Plaintiff's rights by terminating his religious-diet menu.  On August 4, 2020, Defendant Erskine refused to grant Plaintiff's requests to be allowed to have access to the religious diet.

On October 28, 2020, Defendant Houghton allegedly discriminated against Plaintiff by issuing a Class-II misconduct ticket against Plaintiff for apparently not properly reporting for a formal count.  On December 2, 2020, Defendant Sperling improperly conducted COVID-19 nasal-swab tests for a number of prisoners without changing his gloves and, when Plaintiff complained, placed Plaintiff in segregation.  Defendant Depue failed to protect Plaintiff from being stabbed by another prisoner on January 14, 2021.  On February 19, 2021, Defendant Gable allegedly subjected Plaintiff to retaliation by verbally harassing him and refusing to allow him to go to ASAT programming.  Defendant Campfield allegedly violated Plaintiff's rights by terminating him from the ASAT program on February 26, 2021.  On February 28, 2021, shortly after Plaintiff filed a Step-III grievance, Defendant Houghton and former Defendant McAlvey allegedly retaliated against Plaintiff by seizing his legal footlocker and other personal property.  In addition, Plaintiff alleges that Defendant Gonzolas violated his rights under the ADA by failing to train employees to properly interact with deaf inmates.  Plaintiff also alleges that Defendant Rewerts failed to train and supervise his subordinates in numerous ways.

Plaintiff seeks declaratory and injunctive relief and compensatory and punitive damages.

## II.    Misjoinder

Federal Rule of Civil Procedure 20(a) limits the joinder of parties in a single lawsuit, whereas Federal Rule of Civil Procedure 18(a) limits the joinder of claims.  Rule 20(a)(2) governs when multiple defendants may be joined in one action: "[p]ersons . . . may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action."  Rule 18(a) states:  "A party asserting a claim . . . may join, as independent or alternative claims, as many claims as it has against an opposing party."

Courts have recognized that, where multiple parties are named, as in this case, the analysis under Rule 20 precedes that under Rule 18:

> Rule 20 deals solely with joinder of parties and becomes relevant only when there is more than one party on one or both sides of the action.  It is not concerned with joinder of claims, which is governed by Rule 18.  Therefore, in actions involving multiple defendants Rule 20 operates independently of Rule 18. . . .
>
> Despite the broad language of Rule 18(a), plaintiff may join multiple defendants in a single action only if plaintiff asserts at least one claim to relief against each of them that arises out of the same transaction or occurrence and presents questions of law or fact common to all.

7 Charles Allen Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure Civil* § 1655 (3d ed. 2001), *quoted in Proctor v. Applegate*, 661 F. Supp. 2d 743, 778 (E.D. Mich. 2009), *and Garcia v. Munoz*, No. 08-1648, 2008 WL 2064476, at *3 (D.N.J. May 14, 2008); *see also United States v. Mississippi*, 380 U.S. 128, 142–43 (1965) (joinder of defendants is permitted by Rule 20 if both commonality and same transaction requirements are satisfied).

Therefore, "a civil plaintiff may not name more than one defendant in his original or amended complaint unless one claim against each additional defendant is transactionally related to the claim against the first defendant and involves a common question of law or fact."  *Proctor*,

661 F. Supp. 2d at 778 (internal quotation omitted).  When determining if civil rights claims arise from the same transaction or occurrence, a court may consider a variety of factors, including, "'the time period during which the alleged acts occurred; whether the acts . . . are related; whether more than one act . . . is alleged; whether the same supervisors were involved, and whether the defendants were at different geographical locations.'"  *Id.* (quoting *Nali v. Mich. Dep't of Corr.*, No. 07-10831, 2007 WL 4465247, at *3 (E.D. Mich. Dec. 18, 2007)).

Permitting the improper joinder in a prisoner civil rights action also undermines the purpose of the PLRA, which was to reduce the large number of frivolous prisoner lawsuits that were being filed in the federal courts.  *See Riley v. Kurtz*, 361 F.3d 906, 917 (6th Cir. 2004).  Under the PLRA, a prisoner may not commence an action without prepayment of the filing fee in some form.  *See* 28 U.S.C. § 1915(b)(1).  These "new fee provisions of the PLRA were designed to deter frivolous prisoner litigation . . . 'by making all prisoner [litigants] . . . feel the deterrent effect created by liability for filing fees.'"  *Williams v. Roberts*, 116 F.3d 1126, 1127–28 (5th Cir. 1997) (quoting *Jackson v. Stinnett*, 102 F.3d 132, 136–137 (5th Cir. 1996)).  The PLRA also contains a "three-strikes" provision requiring the collection of the entire filing fee after the dismissal for frivolousness, etc., of three actions or appeals brought by a prisoner proceeding in forma pauperis, unless the statutory exception is satisfied.  28 U.S.C. § 1915(g).  The "three strikes" provision was also an attempt by Congress to curb frivolous prisoner litigation.  *See Wilson v. Yaklich*, 148 F.3d 596, 603 (6th Cir. 1998).

The Seventh Circuit has explained that a prisoner like plaintiff may not join in one complaint all of the defendants against whom he may have a claim, unless the prisoner satisfies the dual requirements of Rule 20(a)(2):

> Thus multiple claims against a single party are fine, but Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2.

13

> Unrelated claims against different defendants belong in different suits, not only to prevent the sort of morass that [a multi]-claim, [multi]-defendant suit produce[s] but also to ensure that prisoners pay the required filing fees—for the Prison Litigation Reform Act limits to 3 the number of frivolous suits or appeals that any prisoner may file without prepayment of the required fees. 28 U.S.C. § 1915(g) . . . .

> A buckshot complaint that would be rejected if filed by a free person—say, a suit complaining that A defrauded the plaintiff, B defamed him, C punched him, D failed to pay a debt, and E infringed his copyright, all in different transactions— should be rejected if filed by a prisoner.

*George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007); *see also Brown v. Blaine*, 185 F. App'x 166, 168–69 (3d Cir. 2006) (allowing an inmate to assert unrelated claims against new defendants based on actions taken after the filing of his original complaint would have defeated the purpose of the three strikes provision of PLRA); *Patton v. Jefferson Corr. Ctr.*, 136 F.3d 458, 464 (5th Cir. 1998) (declining to allow "litigious prisoners to immunize frivolous lawsuits from the 'three strikes' barrier by the simple expedient of pleading unexhausted habeas claims as components of § 1983 suits"); *Shephard v. Edwards*, No. C2-01-563, 2001 WL 1681145, at *1 (S.D. Ohio Aug. 30, 2001) (declining to consolidate prisoner's unrelated various actions so as to allow him to pay one filing fee, because it "would improperly circumvent the express language and clear intent of the 'three strikes' provision"); *Scott v. Kelly*, 107 F. Supp. 2d 706, 711 (E.D. Va. 2000) (denying prisoner's request to add new, unrelated claims to an ongoing civil rights action as an improper attempt to circumvent the PLRA's filing fee requirements and an attempt to escape the possibility of obtaining a "strike" under the "three strikes" rule).  To allow Plaintiff to proceed with improperly joined claims and defendants in a single action would permit him to circumvent the PLRA's filing fee provisions and allow him to avoid having to incur a "strike" for purposes of by § 1915(g), should any of his claims turn out to be frivolous.  Courts are therefore obligated to reject misjoined complaints like Plaintiff's.  *See Owens v. Hinsley*, 635 F.3d 950, 952 (7th Cir. 2011).

Defendant Campfield, who works at DRF, is the first individual listed in the caption of the complaint, but no allegations against him occur until the end of the complaint.  In contrast, the first Defendant named in the body of the complaint is RGC Defendant Warden Bush, and the first set of allegations in the complaint concerns the actions of Defendants Bush and RGC Food Service Director in denying him a kosher diet while he was housed at RGC between August 31 and October 5, 2018.  Defendant Bush, therefore, is properly considered the first Defendant in the complaint for purposes of joinder.  In addition to RGC Defendants Bush and Mulligan, Plaintiff sues Defendant former MDOC SAC Martin for his actions ruling on Plaintiff's eligibility for a kosher diet during that time.  Plaintiff also alleges that Defendant Bush violated his right to access the courts by limiting library privileges and violated the Eighth Amendment by denying sufficient out-of-cell activity.  All other Defendants committed actions at two different correctional facilities over a period of two-and-one-half years following Plaintiff's transfer from RGC.  No other conduct by any Defendant is transactionally related to Plaintiff's claims against Defendants Bush, Mulligan, and Martin.

Under Rule 21 of the Federal Rules of Civil Procedure, "[m]isjoinder of parties is not a ground for dismissing an action."  *Id.*  Instead, Rule 21 provides two remedial options: (1) misjoined parties may be dropped on such terms as are just; or (2) any claims against misjoined parties may be severed and proceeded with separately.  *See Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 572–73 (2004) ("By now, 'it is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time . . . .'") (quoting *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 832 (1989)); *DirecTV, Inc. v. Leto*, 467 F.3d 842, 845 (3d Cir. 2006); *Carney v. Treadeau*, No. 2:07-cv-83, 2008 WL 485204, at *2 (W.D. Mich. Feb. 19, 2008); *Coal. to Defend Affirmative Action v. Regents of Univ. of Mich.*, 539 F.

Supp. 2d 924, 940 (E.D. Mich. 2008); *see also Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 682 (6th Cir. 1988) ("[D]ismissal of claims against misjoined parties is appropriate."). "Because a district court's decision to remedy misjoinder by dropping and dismissing a party, rather than severing the relevant claim, may have important and potentially adverse statute-of-limitations consequences, the discretion delegated to the trial judge to dismiss under Rule 21 is restricted to what is 'just.'" *DirecTV*, 467 F.3d at 845.

At least three judicial circuits have interpreted "on such terms as are just" to mean without "gratuitous harm to the parties." *Strandlund v. Hawley*, 532 F.3d 741, 745 (8th Cir. 2008) (quoting *Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000)); *see also DirecTV*, 467 F.3d at 845. Such gratuitous harm exists if the dismissed parties lose the ability to prosecute an otherwise timely claim, such as where the applicable statute of limitations has lapsed, or the dismissal is with prejudice. *Strandlund*, 532 F.3d at 746; *DirecTV*, 467 F.3d at 846-47.

In this case, Plaintiff brings causes of action under 42 U.S.C. § 1983. For civil rights suits filed in Michigan under § 1983, the statute of limitations is three years. *See* Mich. Comp. Laws § 600.5805(10); *Carroll v. Wilkerson*, 782 F.2d 44 (6th Cir. 1986) (per curiam); *Stafford v. Vaughn*, No. 97-2239, 1999 WL 96990, at *1 (6th Cir. Feb. 2, 1999). The statute of limitations begins to run when the aggrieved party knows or has reason to know of the injury that is the basis of his action. *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

The statute of limitations, however, is subject to tolling. The Sixth Circuit has recognized that, in prisoner civil rights actions, the statute of limitations is tolled for the period during which a plaintiff's available state administrative remedies were being exhausted. *See Brown v. Morgan*, 209 F.3d 595, 596–97 (6th Cir. 2000).

> The Prison Litigation Reform Act amended 42 U.S.C. § 1997e to provide: "No action shall be brought with respect to prison conditions under section 1983 of this

16

> title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (1999) . . . . This language unambiguously requires exhaustion as a mandatory threshold requirement in prison litigation. Prisoners are therefore prevented from bringing suit in federal court for the period of time required to exhaust "such administrative remedies as are available." For this reason, the statute of limitations which applied to Brown's civil rights action was tolled for the period during which his available state remedies were being exhausted.

*Id.* at 596 (citing *Harris v. Hegmann*, 198 F.3d 153, 157–59 (5th Cir. 1999) (per curiam), and *Cooper v. Nielson*, 194 F.3d 1316, 1999 WL 719514 (9th Cir. 1999)). Furthermore, "Michigan law provides for tolling of the limitations period while an earlier action was pending which was later dismissed without prejudice." *Kalasho v. City of Eastpointe*, 66 F. App'x 610, 611 (6th Cir. 2003).

Plaintiff alleges conduct by the URF Defendants which began on March 22, 2019, and the events that occurred at DRF did not begin until September 5, 2019. All of the alleged actions occurred well under three years ago, especially with the benefit of tolling during the administrative-exhaustion period, *Brown*, 209 F.3d at 596, and during the pendency of this action, *Kalasho*, 66 F. App'x at 611. Plaintiff therefore has far more than enough time in his limitations period to file a new complaint against the remaining Defendants and will not suffer gratuitous harm if the improperly joined Defendants are dismissed.

The Court therefore will exercise its discretion under Rule 21 and dismiss all Defendants except Defendants Bush, Mulligan, and Martin without prejudice to the institution of new, separate lawsuits against the dismissed Defendants. *See Coughlin*, 130 F.3d at 1350 ("In such a case, the court can generally dismiss all but the first named plaintiff without prejudice to the institution of new, separate lawsuits by the dropped plaintiffs"); *Carney*, 2008 WL 485204, at *3 (same). If Plaintiff wishes to proceed with his claims against the dismissed Defendants, he

shall do so by filing new civil actions[5] on the forms provided by this Court, *see* W.D. Mich. LCivR

5.6(a), and paying the required filing fee or applying in the manner required by law to proceed *in*

*forma pauperis*.

### III.    Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the

defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While

a complaint need not contain detailed factual allegations, a plaintiff's allegations must include

more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice.").  The court must determine whether the complaint contains "enough

facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at

679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it

asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at

678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court

to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not

'show[n]'—that the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P.

8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the

---

[5] Plaintiff is cautioned that his many and varied claims against the dismissed Defendants are not all properly brought in a single action.  Indeed, even where Plaintiff complains of events that occurred at the same facility, many of those events are unrelated to one another.  Should Plaintiff elect to file new civil actions to present his claims against one or more dismissed Defendants, he may not join in a single action claims against different Defendants that are not transactionally related.

*Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

## IV.     Religious diet at RGC

Plaintiff alleges that Defendants Bush and Mulligan denied him his right to practice his religion, in violation of the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1(a), by refusing to provide him with kosher meals during the 35 days he was housed at RGC. Plaintiff also sues Defendant Martin in relation to the denial of religious meals, but he alleges only that Martin granted his request to participate in the religious diet.

The First Amendment provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend I. The right to freely exercise one's religion falls within the fundamental concept of liberty under the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). Accordingly, state legislatures and those acting on behalf of a state are "as incompetent as Congress" to interfere with the right. *Id.* While "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," inmates clearly retain the First Amendment protection to freely exercise their religion. *See O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted). To

19

establish that this right has been violated, Plaintiff must establish that: (1) the belief or practice he seeks to protect is religious within his own "scheme of things," (2) his belief is sincerely held, and (3) Defendant's behavior infringes upon this practice or belief. *Kent v. Johnson*, 821 F.2d 1220, 1224–25 (6th Cir. 1987); *see also Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (same); *Bakr v. Johnson*, No. 95-2348, 1997 WL 428903, at *2 (6th Cir. July 30, 1997) (noting that "sincerely held religious beliefs require accommodation by prison officials").

Plaintiff has sufficiently alleged his sincerely-held religious beliefs and there is no doubt that the practice of following a kosher diet is a religious practice. The next consideration is "whether the challenged practice of the prison officials infringes on the religious belief . . . ." *Kent*, 821 F.2d at 1224–25. A practice will not be considered to infringe on a prisoner's free exercise unless it "places[s] a substantial burden on the observation of a central religious belief or practice . . . ." *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989); *see also Welch v. Spaulding*, 627 F. App'x 479, 485 (6th Cir. 2015) (McKeague, J., dissenting) ("To violate the First Amendment, the diet must impose a substantial burden on the inmate's exercise of religion.").

"[T]he Supreme Court has made clear that the 'substantial burden' hurdle is high." *Living Water Church of God v. Charter Twp. Of Meridian*, 258 F. App'x 729, 734 (6th Cir. 2007). "[A] 'substantial burden' is a difficult threshold to cross." *Id.* at 736. "'[A] 'substantial burden' must place more than an inconvenience on religious exercise.'" *Id.* at 739 (quoting *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004)). A particular government action will not be considered a substantial burden merely because it "may make [the] religious exercise more expensive or difficult . . . ." *Id.*

The analysis of Plaintiff's RLUIPA claim parallels the analysis of his free exercise claim. In relevant part, RLUIPA prohibits any government from imposing a "substantial burden

on the religious exercise" of a prisoner, unless such burden constitutes the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-1(a). The term "religious exercise" "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7).

The phrase "substantial burden" is not defined in RLUIPA. The Sixth Circuit Court of Appeals has relied upon the Act's legislative history to conclude that the term has the same meaning under RLUIPA as provided by the Supreme Court in its "free exercise" decisions. *Living Water*, 258 F. App'x at 733–34. Accordingly, a burden is substantial where it forces an individual to choose between the tenets of his religion and foregoing governmental benefits or places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* (citations omitted); *Cutter v. Wilkinson,* 544 U.S. 709, 720 (2005) (recognizing that RLUIPA's institutionalized persons provision was intended to alleviate only "exceptional" burdens on religious exercise); *Marshall v. Frank,* 2007 WL 1556872, at *5 (W.D. Wis. May 24, 2007) (quoting *Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752, 761 (7th Cir. 2003)) (a substantial burden is one which renders religious exercise "effectively impracticable")). A burden is less than "substantial" where it imposes merely an "inconvenience on religious exercise," *see, e.g., Konikov v. Orange Cnty., Fla.*, 410 F.3d 1317, 1323 (11th Cir. 2005), or does not "pressure the individual to violate his or her religious beliefs." *Living Water*, 258 F. App'x at 734. Such conclusions recognize that RLUIPA was not intended to create a cause of action in response to every decision which serves to inhibit or constrain religious exercise, as such would render meaningless the word "substantial." *See Civil Liberties for Urban Believers*, 342 F.3d at 761.

Thus, under the First Amendment or RLUIPA, Plaintiff must allege that his religious exercise has been substantially burdened. Plaintiff contends that Defendants

21

intentionally burdened his religious exercise because he was forced to choose between religious adherence and an adequate diet for 35 days.  The Court concludes that Plaintiff's allegations against Defendants Bush and Mulligan are sufficient to state a claim under the First Amendment and RLUIPA.

Plaintiff's allegations against Defendant Martin, however, fail to state a claim under the First Amendment and RLUIPA.  Plaintiff alleges nothing more than that Defendant Martin approved Plaintiff for a kosher diet after evaluating Plaintiff's request and supporting documentation.  (Compl., ECF No. 1, PageID.7.)  Plaintiff wholly fails to allege that Defendant Martin burdened—much less substantially burdened—Plaintiff's practice of his religion.  As a consequence, Plaintiff fails to state a First Amendment or RLUIPA claim against Defendant Martin.  Because Plaintiff makes no other allegations against Defendant Martin for any action that occurred at RGC, the Court will dismiss Defendant Martin from the action with prejudice for failure to state a claim.

## V.      Access to the courts

Plaintiff alleges that Defendant Bush denied him access to the courts by restricting his access to law library materials.  Plaintiff contends that, under Defendant Bush's policies, he was required to identify all legal research by citation and was limited to a total of 10 items of legal materials per week.  Plaintiff also complains that he was not given a legal writer, despite his documented psychological impairments.

It is well established that prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977).  The principal issue in *Bounds* was whether the states must protect the right of access to the courts by providing law libraries or alternative sources of legal information for prisoners.  *Id.* at 817.  The Court further noted that in addition to law libraries or alternative sources of legal knowledge, the states must provide indigent inmates with "paper

and pen to draft legal documents, notarial services to authenticate them, and with stamps to mail

them." *Id.* at 824–25.  The right of access to the courts also prohibits prison officials from erecting

barriers that may impede the inmate's access to the courts.  *See Knop v. Johnson*, 977 F.2d 996,

1009 (6th Cir. 1992).

   An indigent prisoner's constitutional right to legal resources and materials is not,

however, without limit.  In order to state a viable claim for interference with his access to the

courts, a plaintiff must show "actual injury."  *Lewis v. Casey*, 518 U.S. 343, 349 (1996); *see also*

*Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999); *Knop*, 977 F.2d at 1000.  In other words,

a plaintiff must plead and demonstrate that the shortcomings in the prison legal assistance program

or lack of legal materials have hindered, or are presently hindering, his efforts to pursue a

nonfrivolous legal claim.  *Lewis*, 518 U.S. at 351–53; *see also Pilgrim v. Littlefield*, 92 F.3d 413,

416 (6th Cir. 1996).  The Supreme Court has strictly limited the types of cases for which there may

be an actual injury:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into
> litigating engines capable of filing everything from shareholder derivative actions
> to slip-and-fall claims.  The tools it requires to be provided are those that the
> inmates need in order to attack their sentences, directly or collaterally, and in order
> to challenge the conditions of their confinement.  Impairment of any other litigating
> capacity is simply one of the incidental (and perfectly constitutional) consequences
> of conviction and incarceration.

*Lewis*, 518 U.S. at 355.  "Thus, a prisoner's right to access the courts extends to direct appeals,

habeas corpus applications, and civil rights claims only."  *Thaddeus-X v. Blatter*, 175 F.3d 378,

391 (6th Cir. 1999) (en banc).  Moreover, the underlying action must have asserted a non-frivolous

claim.  *Lewis*, 518 U.S. at 353; *accord Hadix v. Johnson*, 182 F.3d 400, 405 (6th Cir. 1999) (*Lewis*

changed actual injury to include requirement that action be non-frivolous).

   In addition, the Supreme Court has squarely held that "the underlying cause of

action . . . is an element that must be described in the complaint, just as much as allegations must

describe the official acts frustrating the litigation." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (citing *Lewis*, 518 U.S. at 353 & n.3). "Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant." *Id.*

Plaintiff's claim fails because he identifies no actual injury to either his criminal appeal or his then-pending civil action caused by the limitations on Plaintiff's law library access. He simply alleges that he had cases pending and perhaps could not access the library as much as he would have preferred. But the Constitution protects a prisoner's right of access to the courts, not to the prison library. *Walker v. Mintzes*, 771 F.2d 920, 931 (6th Cir. 1985); *see also Lewis*, 518 U.S. at 351 (a sub-par library or legal assistance program does not establish relevant actual injury). "There is no constitutional right to any particular number of hours in the law library." *Thomas v. Campbell*, 12 F. App'x 295, 297 (6th Cir. 2001) (citing Walker, 771 F.2d at 932). And Plaintiff has alleged no injury to his ability to access the courts.

Moreover, Plaintiff was appointed counsel for his criminal appeal. *See People v. Resch*, No. 347325 (Mich. Ct. App.) (docket sheet), https://www.courts.michigan.gov/c/courts/coa/case/347325/. A prisoner who is represented by counsel has no freestanding right to access a jail law library. "[P]rison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *Lewis*, 518 U.S. at 351 (quoting *Bounds*, 430 U.S. at 825). An inmate's right of access to the courts is fully protected if he is represented by counsel. *Skelton v. Pri-Cor, Inc.*, 963 F.2d 100, 104 (6th Cir. 1991); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984) (citing *Holt v. Pitts*, 702 F.2d 639, 640 (6th Cir. 1983) (holding that, once counsel has been appointed, the state has fulfilled its constitutional obligation

24

to provide access to the courts)); *see also United States v. Sammons*, 918 F.2d 592, 602 (6th Cir. 1990) (defendant's waiver of right to court-appointed counsel and decision to represent self in defense of criminal prosecution constituted waiver of right of access to law library); *Holt*, 702 F.2d at 640-01 (same).

Further, Plaintiff could not possibly show actual injury to the prosecution of his civil case, as he did not file that case until after he was transferred out of RGC.  *See Resch v. Municipality of Macomb Cnty.*, No. 2:18-cv-13607 (E.D. Mich.) (filed Nov. 19, 2018).  Moreover, any delay in filing, much less a 35-day delay, could not have prejudiced the timeliness of his action, as the claims alleged in the civil case arose between November 2017 and August 2018, well within the limitations period.

Because Plaintiff has not alleged and cannot allege that he suffered actual injury to any relevant litigation, his access-to-the-courts claim will be dismissed for failure to state a claim.

## VI.    Eighth Amendment

Plaintiff alleges that Defendant Bush provided him inadequate out-of-cell exercise during the 35 days he remained at RGC.  More specifically, he alleges that he was allowed only 50 minutes of out-of-cell activity every 48 to 72 hours.  Plaintiff appears to be alleging a violation of the Eighth Amendment.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes.  Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency."  *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981).  The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain."  *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346).  The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities."  *Rhodes*, 452 U.S. at 347; *see also Wilson*

*v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998).  The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement."  *Rhodes*, 452 U.S. at 348 (citation omitted).  Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment."  *Ivey*, 832 F.2d at 954.  "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'"  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347).  As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim."  *Id.*  In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety."  *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)).

The Eighth Amendment entitles prisoners to exercise sufficient to maintain reasonably good physical and mental health.  *See Walker*, 771 F.2d at 927.  Thus, the Sixth Circuit has held that extreme limitations on outdoor exercise could potentially violate the Eighth Amendment.  *See Rodgers v. Jabe*, 43 F.3d 1082, 1087–88 (6th Cir. 1995) (citing *Walker*, 771 F.2d at 927, and *Patterson v. Mintzes*, 717 F.2d 284 (6th Cir. 1983)).  Yet, the court has declined to find that minimum yard time is constitutionally required in all circumstances.  *Rodgers*, 43 F.3d at 1087–88.  Instead, the court has held that when yard time is extremely limited or denied altogether, the prison may be required to provide a legitimate penological purpose for the deprivation.  *Id.* (citing *Patterson*, 717 F.2d at 289).

Here, Plaintiff alleges that he received out-of-cell exercise every two to three days. Such allegations fall well short of an extreme limitation on exercise that might require prison officials to articulate a legitimate penological reason for the limitation.  While Plaintiff may have preferred out-of-cell exercise, he makes no allegation that he could not exercise in his cell in order to maintain his physical and mental health.  Plaintiff's allegations therefore fail to state an Eighth Amendment claim against Defendant Bush.

## VII.    Pending motion

Plaintiff has filed a motion (ECF No. 6) seeking an order waiving the requirement that he pay an initial partial filing fee of $2.88 when funds become available, which the Court construes as a motion seeking reconsideration of the order granting Plaintiff leave to proceed *in forma pauperis* in this action (ECF No. 3).

Under Rule 54(b) of the Federal Rules of Civil Procedure, a non-final order is subject to reconsideration at any time before entry of a final judgment.  *Id.*; *see also ACLU v. McCreary Cnty.*, 607 F.3d 439, 450 (6th Cir. 2010).  Western District of Michigan Local Civil Rule 7.4(a) provides that "motions for reconsideration which merely present the same issues ruled upon by the court shall not be granted."  Further, reconsideration is appropriate only when the movant "demonstrate[s] a palpable defect by which the court and the parties have been misled . . . [and] that a different disposition of the case must result from a correction thereof."  *Id.*

Plaintiff complains that he recently became aware that the instant action would not proceed unless the initial partial filing fee was paid.  Because the MDOC takes all of his income to pay preexisting institutional debt, Plaintiff argues that he is unable to pay the initial partial filing fee.  He therefore seeks release from the obligation.

Plaintiff is not entitled to relief on his motion.  First, under 28 U.S.C. § 1915(b)(1)-(2), the Court is required to order prisoner plaintiffs to pay the full filing fee, assigning an initial

partial filing fee where one can be calculated and directing the payment of the remainder of the filing fee in installments under a statutory formula.  The Court properly calculated the initial partial filing fee in the instant case.  Plaintiff therefore is not entitled to relief from the calculated payments.

Nevertheless, under § 1915(b)(4), no prisoner shall be prohibited from bringing a civil action because of his inability to pay the initial partial filing fee.  In such circumstances, courts impose the initial partial filing fee and direct its payment when funds become available, and the action is permitted to proceed without prepayment of the initial partial filing fee.  *See McGore v. Wrigglesworth*, 114 F.3d 601, 606 (6th Cir. 1997), *overruled in other part by LaFountain v. Harry*, 716 F.3d 944, 951 (6th Cir. 2013).  This Court issued precisely such an order, and Plaintiff has been permitted to proceed with his action notwithstanding his inability to pay the initial partial filing fee.

For both reasons, Plaintiff fails to demonstrate error, much less palpable error, in the Court's April 6, 2021 order granting pauper status.  Plaintiff's motion therefore will be denied.

## Conclusion

Having reviewed the complaint under Rule 21 of the Federal Rules of Civil Procedure, the Court will dismiss without prejudice as misjoined Plaintiff's claims against Defendants Campfield, Washington, Horton, Rewerts, Adamson, Beaulieu, Gonzolas, Allenbaugh, Labo, Wellman, Brunettea, Stavida, Rink, Buchanan, Purchase, Ray, Edlinger, Ferrell, Allen, Rideout, Freed, Erskine, Bartin, Sperling, Depue, Keck, Gable, Houghton, Holmes, Hoffman, Dine, Lambert, Ward, and Stott.  Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendant Martin will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).  The Court will also dismiss, for failure to state a claim, Plaintiff's access-to-the courts and Eighth

Amendment claims against Defendant Bush.  Plaintiff's First Amendment and RLUIPA claims against Defendants Bush and Mulligan remain in the case.  Finally, the Court will deny Plaintiff's pending motion (ECF No. 6).

        An order consistent with this opinion will be entered.


Dated:    <u>October 12, 2021</u>               <u>/s/ Janet T. Neff</u>
                                               Janet T. Neff
                                               United States District Judge